UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------- x

ERICK LEWIS,

                Petitioner,

    -against-

NEW YORK STATE,

                Respondent.

------------------------------------------------- x

MEMORANDUM & ORDER

14-CV-03906 (ENV)

VITALIANO, D.J.

      Erick Lewis has filed a *habeas corpus* petition, *pro se*, pursuant to 28 U.S.C. § 2254. He

was convicted by a jury in 2010 on multiple counts stemming from the brutal sexual assaults of

three Brooklyn women. Lewis contends (i) that he was denied a fair trial, (ii) that his right to

confront the witnesses against him under the Confrontation Clause was violated, (iii) that the trial

judge was biased and the sentence excessive, and (iv) that he was "force[d] to go to trial." Two

additional grounds in his papers appear to be a result of scrivener's error. For the reasons set forth

below, the writ is denied and the petition is dismissed.

Background

      The challenged convictions arise from three separate sexual assaults, on three otherwise

unrelated women, in the Crown Heights area of Brooklyn. The attacks came in January 2008,

August 2008, and September 2008.[1] Police canvassed the neighborhood in which the assaults

occurred, checked security cameras of local businesses and spoke with neighbors, all in an effort to

find the perpetrator. Transcript Record, *People v. Lewis*, Indict. No. 5005/09 (Sup. Ct., Kings

---

[1]     Because Lewis was convicted, the Court recites the facts in the light most favorable to the
verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012). Additionally, due to the sexual
nature of the charges, the complainants will be referred to as complaining witness 1 ("CW-1") (for
the January attack), complaining witness 2 ("CW-2") (for the August attack), and complaining
witness 3 ("CW-3") (for the September attack).



County, 2010) ("Tr.") at 334-35.[2] The initial investigatory steps were to no avail. The investigation took a positive turn after detectives received a tip leading to petitioner. *Id.* at 392-93. Police attempted to locate Lewis at his last known address, which background checks revealed to be in the same Crown Heights area. *Id.* at 394-96. Detectives were still unable to bring Lewis into custody until a "Crime Stoppers" tip, received on or about October 1, 2008, alerted them that Lewis was heading south to his cousin's home in Alabama. *Id.* at 412-13. With the help of Alabama authorities, Lewis was arrested at a bus depot in Birmingham, *id.* at 413. He was extradited to New York on October 14, 2008, *id.* at 414-15, 421.

Months after his apprehension in Alabama, on February 2, 2009, CW-1 and CW-3 independently picked Lewis out of a lineup.[3] *Id.* at 131-33, 304-07. He was thereafter formally charged with various crimes related to the three attacks.[4]

Lewis went to trial on July 27, 2010. Tr. at 2. In its opening, the People sketched out a case that would prove the devastating attacks on the three victims. The opening also described the investigatory fits and starts that followed. A major breakthrough in the investigation came,

---

[2] The trial transcript begins at Dkt. No. 6-3, on ECF page 59 of 160. All references to the trial transcript are to the original pagination.

[3] CW-2 was asked to view the lineup, but she was unable to do so because she was out of the state at the time. Tr. at 247-48.

[4] Lewis was charged with attempted criminal sexual act in the first degree, attempted sexual misconduct, sexual abuse in the first degree, sexual abuse in the third degree, assault in the second degree, assault in the third degree, menacing in the third degree and harassment in the second degree for the attack on CW-1. Dkt. No. 6-1 at 53-54 (citing Kings County Indictment Number 5005/2009). With respect to CW-2, Lewis was charged with rape in the first degree, two counts of sexual abuse in the first degree, two counts of sexual misconduct, criminal sexual act in the first degree, robbery in the first degree, robbery in the third degree, grand larceny in the fourth degree, petit larceny and harassment in the second degree. *Id.* As to CW-3, Lewis was charged with two counts of criminal sexual act in the first degree, three counts of sexual abuse in the first degree, two counts of sexual misconduct, sexual abuse in the third degree, robbery in the third degree, grand larceny in the fourth degree, petit larceny and harassment in the second degree. *Id.*

2

explained the prosecutor, when the DNA recovered from the crime scene involving CW-2 was determined to match DNA recovered from CW-3, *id.* at 17-28, and was then linked to DNA obtained from Lewis, *id.* at 29.

The proof would hew tightly to the prosecutor's preview. There was evidence to show that, on January 17, 2008, CW-1 was sexually assaulted in the laundry room of her Crown Heights apartment building. Tr. at 104-59. During the assault, the perpetrator approached her from the back, grabbed her by the neck, shoved her up against a wall, and choked her. *Id.* at 115-18, 149, 157. CW-1 described, in vivid detail, about how she was standing face-to-face with the assailant as he repeatedly punched her with a closed fist, *id.* at 118-19, 147, 157-58. The assailant then pulled his pants down, and CW-1 observed that her attacker was wearing a condom. *Id.* at 120, 150. Frustrated with CW-1's noncompliance with his sexual demands, he then pulled up his pants. Before leaving the laundry room, however, the assailant threatened to kill CW-1, stating that he "knew where [she] lived and [that] if [she] told anyone, . . . [he] would come and kill [her]." *Id.* at 121. In shock, CW-1 hid in the laundry room. When she heard her attacker leave, she ran to her apartment, where her mother called the police. *Id.* at 123-24.

CW-1's mother described that CW-1 was bruised and crying when she returned to the apartment after the assault. After calling them herself, the mother met with the police when they arrived. *Id.* at 99-100. The victim was taken to the hospital where she gave a statement to a Detective Roman, including a description of her assailant. The description specifically referenced the assailant's gold cap or tooth.

Changing scenes, CW-2 testified in graphic detail how, on the night of August 16 or early morning on August 17, upon returning home from dinner at a friend's apartment, she was confronted by a man in the vestibule of her apartment building. *Id.* at 216, 218-22. As she entered the lobby, she noticed an unfamiliar man, who, she thought, appeared nervous. *Id.* at 220-21. She

3

was momentarily relieved when the man boarded one of two elevators, leaving her alone in the lobby. *Id.* at 225. Her relief was fleeting. After boarding the second elevator, it stopped unexpectedly on the second floor, where the nervous man from the lobby reappeared and entered her elevator with a gun. *Id.* at 225-26. He pointed the gun at CW-2's temple and pushed her against the elevator wall. At one point, he was face-to-face with CW-2. *Id.* at 226, 231, 234. Lewis threatened to kill CW-2, stating, "Don't turn around. If you turn around, I'll [shoot] you. If you scream, I'll kill you. I've done this before. I'm going to get away with it." *Id.* at 231; *see also id.* at 227-28, 233. After forcing CW-2 to take off her pants and underwear, he raped her with the gun at her back. For good measure, the assailant fled with CW-2's purse. *Id.* at 232-34.

Having heard the perpetrator leave the building, CW-2 ran to her neighbors' apartment. The neighbors would later describe CW-2 as hysterical for 15-20 minutes, speaking in fragments they eventually pieced together as "He had a gun. I was raped." *Id.* at 236, 265, 285. The neighbors then accompanied CW-2 to Methodist Hospital, where a sexual assault evidence collection kit was used in an effort to obtain identification of the attacker. *Id.* at 241-42, 272-73. Upon her release from the hospital, CW-2 met with a detective from the Brooklyn Special Victims Squad and provided a description of her attacker. This description, too, mentioned a gold front tooth. *Id.* at 242-44, 334.

CW-3 was the last victim to take the stand, giving harrowing and all too familiar testimony. Again, a simple trip home, on September 11, 2008, resulted in another a brutal elevator attack. Tr. at 294. CW-3, as she described it, encountered a young man in the elevator of her apartment building. *Id.* at 292. When the elevator doors closed, the young man grabbed her, covered her mouth with his hands, and placed CW-3 in a chokehold. *Id.* at 295. During the assault, CW-3 came face-to-face with her assailant. *Id.* at 294. CW-3 begged the assailant to stop. He did not; he pushed CW-3 to the ground, forced his penis into her mouth, and sexually assaulted her. *Id.* at 297-

4

98. During the course of the attack, the assailant threatened to blow CW-3's head off. *Id.* at 298, 313. Before he fled, and in common with the prior episodes, the assailant stole $80 from his victim. *Id.* at 298-300. As he left, he threatened CW-3 that she "better not call the cops because [he knew] where [she] lived." *Id.* at 299. She did call, nonetheless, and sought medical treatment at Long Island College Hospital, where she also met with detectives from Brooklyn's Special Victim's Squad. *Id.* at 302.

The DNA evidence on top of the victims' tales of horror assumed the usual prominence in the prosecutor's case. Daniel Boggiano, assigned to the NYPD Crime Scene Unit ("CSU"), explained how he photographed the laundry area where the attack on CW-1 occurred, collected DNA swabs from the door handles, and provided the samples for vouchering. Tr. at 35, 41, 44, 46. Dr. Hillary Fairbrother, the physician at New York Methodist who performed the sexual assault kit collection procedures on CW-2, testified as to those procedures. *Id.* at 365, 373-75. Officer Carlos Pantoja, also from CSU, described how he documented the scene of the attack on CW-3. *Id.* at 166-67, 172-83, 327-28. Detective Maribel Roman described how, once apprehended, she procured oral swabs from Lewis. *Id.* at 501-10.

Knitting the DNA evidence together, a criminalist from the Office of the Chief Medical Examiner ("OCME"), Dr. Craig O'Connor, explained the tests he conducted on (i) swabs collected from two separate doorknobs of the laundry room where CW-1 was attacked, and (ii) the oral swabs taken from CW-1 and, later, those taken from Lewis. *Id.* at 437, 452-58. Though Dr. O'Connor was not able to definitively link Lewis to the DNA collected from the CW-1 crime scene, Lewis could not be "excluded as a contributor to" the DNA mixtures pulled from one of the door knobs and CW-1's mouth. *Id.* at 459. To put this in context, O'Connor testified that, "if [one] were to take a random person's [DNA] . . . [one] would expect that person to be excluded . . . ." *Id.* at 459, 483-84, 490.

The People called as its final witness Lydia DeCastro, an OCME criminologist. *Id.* at 540. DeCastro's laboratory had received and examined the sexual assault kit collected from CW-2. *Id.* at 554. The male DNA profile generated from this kit, DeCastro said, could be expected in "one in greater than one trillion people." *Id.* at 562. DeCastro's laboratory also received the DNA swab recovered from the elevator floor where the sexual assault of CW-3 occurred. *Id.* at 563. There too, the statistical analysis that was performed on the floor sample produced a male DNA profile that was one in "greater than one trillion people." *Id.* at 567. The evidence at crescendo was, powerfully, that the DNA profile produced in CW-2's case matched that produced in the attack on CW-3,[5] *id.* at 567-68. Finally, DeCastro testified that when the laboratory received an oral swab containing DNA from the then-apprehended Erick Lewis, it would tie it all together. *Id.* at 570-71. After an oral swap was obtained from Lewis, DeCastro confirmed that the DNA collected from Lewis matched the DNA samples extracted from the victim or at scene of the attacks on CW-2 and CW-3. Lewis was the contributor of the male DNA that had been collected in those two cases. *Id.* at 571.[6]

Lewis was the sole defense witness. Tr. at 594. He offered a complete denial. He said that he had never seen the victims before encountering them during trial, and he even told the jury that he had never entered any of the residential buildings where the attacks occurred. *Id.* at 596-97. He could not recall, he said, where he had been on any of the days on which the women were assaulted.

---

[5]     Though DeCastro's laboratory received the kit with material extracted from CW-1, no male DNA could be recovered. Tr. at 569.

[6]     The witnesses described above are not exhaustive of the prosecution's case. The People called various other detectives, officers and physicians. *Id.* at 189, 196-201 (Officer Vincent Damiano and Officer Christopher Savage); *id.* at 522 (Charlene An); *id.* at 259, 282 (CW-2's neighbors); *id.* at 330, 334, 337, 339 (Detective David Kellner); *id.* at 314 (Officer Felix Medina); *id.* at 323 (Officer Luis Martinez); *id.* at 405 (Detective Hector Bruno); *id.* at 496 (Officer Paul Banks); *id.* at 382 (CW-3's boyfriend); *id.* at 390, 428, 513-15, 518-19 (Officer Steven Litwin, Detective Evelyn Gutierrez, Detective Elizabeth Murray, Detective Jarrett Brown).

*Id.* at 598. According to Lewis, all three victims were mistaken in their identification of him as their assailant and the DNA matches were not correct. *Id.* at 600, 614-16. Defense counsel also developed testimony about how Lewis had silver fronts on his teeth in 2008, not gold, as the witnesses had testified. *Id.* at 599.

The summations were unsurprising. The defense called attention to claimed mistakes in the police investigation to fit its mistaken identity theory of defense. *Id.* at 621-22. Defense counsel argued that the initial descriptions given by the victims to the police varied from Lewis's physical appearance in 2008, *id.* at 623-24. He highlighted how the People had failed to produce the mysterious gold fronts. *Id.* at 627. It was a point counsel underscored by emphasizing that arresting officers had confiscated Lewis's silver fronts upon arrest and, given their exculpatory nature, were never returned. Counsel also attempted to poke holes in the DNA analysis, by pointing out that, in the process of such an analysis, "[a] lot of other people touch[ed] the work and . . . sign[ed] off on the work" who were not present at trial, *id.* at 628. Hoping to make a point about the unreliability of DNA evidence, counsel observed that even the People would have to acknowledge that the DNA report on CW-1 was not as definite as the other two reports supposedly were. *See id.* at 631. There were, he said, surely too many unanswered questions to support conviction. *Id.* at 633-34.

Summation by the People was equally predictable. It was a methodical recapitulation of the evidence of the three brutal assaults, the lineup identifications, and the compelling DNA evidence. *Id.* at 638-57. The prosecutor also drew upon the similarities of the three attacks – the locations and what the assailant said to each victim – to argue that these crimes were connected by a "unique mo[d]us operandi." *Id.* at 653-55.

On August 4, 2010, the jury convicted Lewis of attempted criminal sex act in the first degree, two counts of sexual abuse in the first degree, assault in the second degree, rape in the first

7

degree, three counts of criminal sexual act in the first degree and two counts of robbery in the first

degree. Tr. 707-08. He was sentenced to 25 years for attempted criminal sex act in the first degree,

7 years for each sexual abuse in the first degree, 7 years for assault in the second degree, 25 years

for rape in the first degree, 25 years for each criminal sex act in the first degree, 25 years for

robbery in the first degree and 3 and a half to 7 years for robbery in the third degree. Dkt. No. 6-7,

Sentencing Transcript, ("S. Tr.") at 14-15.[7] All sentences were to run consecutively. *Id.* at 15. The

court also imposed consecutive periods of post-release supervision.

In May 2012, Lewis, through assigned counsel, appealed his conviction. *See People v.*

*Lewis*, 101 A.D.3d 1154, 956 N.Y.S.2d 526 (2d Dep't 2012). The direct appeal raised four grounds

for relief. First, Lewis argued that he was denied a fair trial because of the trial court's erroneous

*Sandoval* ruling[8], which, according to Lewis, "allowed the jury to learn the underlying facts of a

prior crime that was extremely similar to one of the charged crimes[.]" Dkt. No. 6-1 ("Lewis App.

Br.") at 23. More specifically, he explained that the trial court permitted the prosecutor to cross-

examine him about facts underlying prior grand and petit larceny convictions. *See* Lewis App. Br.

at 25-28. The argument got no traction in the Appellate Division, which found that this ruling was

"a provident exercise of discretion." *Lewis*, 101 A.D.3d at 1155.

As for the other grounds, Lewis argued that the trial court's *Molineux* ruling—which

allowed the prosecutor to argue to the jury that similar language and statements made by the

perpetrator during the three separate assaults tended to show that the same person committed them

---

[7]     The sentencing transcript begins at Dkt. No. 6-7, on ECF page 120 of 140. All references to
the sentencing transcript are to the original pagination.

[8]     In *People v. Sandoval*, 34 N.Y.2d 371, 375-77, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974),
the Court of Appeals established a procedure for defendants to obtain an advanced ruling on the
scope of a prosecutor's cross-examination regarding "prior specific criminal, vicious or immoral
conduct" should the defendant decide to testify.

8

and was probative of a *modus operandi*—denied him a fair trial. Lewis App. Br. at 28-35; *see*

*People v. Molineux*, 168 N.Y. 264 (1901). But, the Second Department rejected the *Molineux* point

out of hand as unpreserved for appellate review, though the court did note that, in any event, "the

three incidents were sufficiently distinctive and similar to each other as to establish a *modus*

*operandi*, such that, in her summation, the prosecutor was properly permitted to comment upon the

similarities." *Lewis*, 101 A.D.3d at 1154.

Lewis's third challenge raised a Sixth Amendment lament that he was denied the right to

confront the witnesses against him as a result of the introduction of DNA evidence through

individuals who, as Lewis argued, did not have firsthand knowledge of the testing. *See* Lewis App.

Br. at 35. Again, the Appellate Division determined that Lewis had failed to preserve it and that, in

any event, the argument was substantively without merit. *Lewis*, 101 A.D.3d at 1155. In his final

claim, Lewis asserted that the sentence imposed against him of more than 174 years was unduly

harsh and excessive – in light of the trial court's "spiteful remarks." Lewis App. Br. at 38. The

Appellate Division was not persuaded, finding that the sentence, in fact, was not excessive. *Lewis*,

101 A.D.3d at 1155.

On January 22, 2013, Lewis sought leave to appeal to the Court of Appeals, which was

denied. *People v. Lewis*, 20 N.Y.3d 1101, 988 N.E.2d 535 (2013). Finally, on June 19, 2014,

Lewis timely filed this petition seeking a federal writ of *habeas corpus*.

<u>Applicable Legal Standards</u>

In principal part, federal habeas relief is governed by the Anti-terrorism and Effective Death

Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), which provides that a writ of

*habeas corpus* shall not issue with respect to any claim of a prisoner in state custody that was

adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or, (2) "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). Such deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether that court gives reasons for its determination or refers to federal law in its decision. *Harrington v. Richter*, 562 U.S. 86, 98-99, 131 S. Ct. 770, 784-85, 178 L. Ed. 2d 624 (2011); *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view [of Congress] that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. 86 at 102-03 (citation and internal quotations omitted). Review under AEDPA "demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66, 132 S. Ct. 490, 491, 181 L. Ed. 2d 468 (2011) (citation and internal quotations omitted). Where AEDPA deference applies, "[a] state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

*Habeas corpus* jurisprudence, given these ground rules, is well-cabined. For the purposes of federal *habeas* review, "clearly established federal law" refers to the holdings, as opposed to *dicta*, of Supreme Court decisions that are controlling law at the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). A state court decision is "contrary to clearly established federal law," within the meaning of § 2254(d), if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. *Id.* at 405-06. A state court decision is classified as one resting on an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* at 413. Even erroneous state court decisions, then, if deemed reasonable, will survive *habeas* review. *Id.* at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before *habeas* relief may be granted. *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (citation omitted). However, "a federal court may reverse a state court ruling where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (quoting *Harrington*, 562 U.S. at 103). "If this standard is difficult to meet – and it is – that is because it was meant to be." *Burt v. Titlow*, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013) (citation and internal quotations omitted).

AEDPA superimposes another obstacle to federal habeas relief, where a habeas claim was denied by the state court on independent state law procedural grounds. A federal petitioner can only overcome such a procedural bar by either "show[ing] cause for failing to [comply with the state procedural requirement] and prejudice therefrom" or "show[ing] that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey v. Zant*, 499 U.S. 467, 494-95, 111 S. Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

To satisfy the first standard, *i.e.* show cause, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *Id.* at 493 (citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Such "objective factors" can include "interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel." *McCleskey*, 499 U S. at 493-94 (citation and internal quotations omitted). Once cause has been demonstrated, the petitioner must show "actual prejudice resulting from the errors of which he complains." *Id.* at 494 (citation and internal quotations omitted).

11

Alternatively, a petitioner can seek to meet the much higher burden of showing that upholding the state-court procedural bar would result in a "fundamental miscarriage of justice," but such a showing is limited to "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.*

Discussion

I.    The Right to a Fair Trial

Lewis zeroes in on the trial court's *Molineux* ruling, which, he contends, denied him a fair trial because it permitted the prosecutor to argue that the three charged attacks were committed by means of a unique *modus operandi* based on the threats made to each victim. Lewis argues that this was error because "the threats were not unique and the perpetrators used different language to convey them", and, similarly, he argues that the trial court's improper *Sandoval* ruling, which allowed the jury to learn the underlying facts of a prior crime that was extremely similar to one of the charged crimes, denied him a fair trial. Dkt. No. 1. at ECF 8 ("Pet.").

A.    The *Molineux* Ruling

The road Lewis must travel to succeed on his claim grew steeper and longer when the Appellate Division determined that the claim was unpreserved for appellate review. *Lewis*, 101 A.D.3d at 1154. Even assuming the presence of a plausible federal constitutional challenge, that the state court, as it did here, has found an independent and adequate state ground to affirm the conviction bars federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 729-32, 111 S. Ct. 2546, 2554-55, 115 L. Ed. 2d 640 (1991) (Federal courts must refrain from granting *habeas* relief on a claim barred from state-court review on procedural grounds.). Lewis, furthermore, has made no showing of a fact or law that would excuse application of the ordinary bar. *See e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591, 146 L. Ed. 2d 518 (2000) (no procedural bar, given cause to excuse default, resulting in prejudice); *Schlup v. Delo*, 513 U.S. 298, 321, 115 S. Ct.

851, 864, 130 L. Ed. 2d 808 (1995) (no procedural bar given a showing of actual innocence resulting in a "fundamental miscarriage of justice"); *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (no bar when state procedural ground is not "adequate"). As a consequence, Lewis has defaulted on this claim in state court and AEDPA bars relief.

Nor would the result be different, here, as the Second Department held, had the claim been considered on the merits. *See Lewis*, 101 A.D.3d at 1154. Clearly, there were distinct similarities across the three attacks to support the trial court's *Molineux* ruling. The trial court's ruling was a correct application of New York evidence law. *See People v. Salton*, 74 A.D.3d 997, 997-98, 905 N.Y.S.2d 199 (2d Dep't 2010); *see also People v. Beam*, 57 N.Y.2d 241, 250-51, 441 N.E.2d 1093, 455 N.Y.S.2d 575 (1982).

Far more significantly, even had it been wrong, that ruling would not offend the federal constitution since, "[a] decision [by a state trial court] to admit evidence of a criminal defendant's uncharged crimes or bad acts under *Molineux* constitutes an evidentiary ruling based on state law." *Sierra v. Burge*, No. 06 CIV. 14432 (DC), 2007 WL 4218926, at *5 (S.D.N.Y. Nov. 30, 2007). To constitute grounds for *habeas* relief, a petitioner must show that the alleged evidentiary error violated an identifiable constitutional right. *See id.* Even assuming trial error, Lewis has not shown that any alleged error was unduly prejudicial as to deprive him of a fundamentally fair trial. An erroneous admission of evidence rises to the level of a constitutional violation "only if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (citation and internal quotations omitted). In fact, the evidence of Lewis's guilt, especially based on eyeball to eyeball identifications by the victims and the DNA matches, was overwhelming. There was no showing of a fundamental miscarriage of justice.

B. The *Sandoval* Ruling

Petitioner's challenge to the trial court's *Sandoval* ruling is cut from the same cloth as his *Molineux* challenge. It fares no better. To comply with *People v. Sandoval*, a trial court must make a pre-trial determination regarding which of a defendant's prior convictions and/or bad acts a prosecutor may inquire into should that defendant testify. 34 N.Y.2d 371. Here, before trial, the court ruled that the prosecutor would be permitted to cross examine Lewis regarding the facts underlying a grand larceny conviction in 2006, where he pled guilty to robbing a woman in the lobby of a residential building. *See* Tr. at 602-06. The court also ruled that the prosecutor could elicit testimony regarding a petit larceny conviction entered the same year. *Id.* at 606-07. The court set out its reasoning:

> In deciding the *Sandoval* application, the Court must balance the prejudicial effect versus the probative value. Certainly, the Court, the defense nor the prosecution would want an individual convicted merely because of propensity. An individual should only be convicted based upon the evidence before the jury. However, the jury does have an absolute right to be able to judge the credibility of the declarant on the stand. And an individual should not be so shielded as that the jury be misled about his character. In addition, because an individual specializes in a certain type of offense, does not immunize him under *Sandoval*.
>
> Balancing all of those factors, I'll allow the People to inquire as to the Grand Larceny Four conviction and the underlying facts.
>
> Regarding the conviction for the misdemeanor Petit Larceny, I'll allow the District Attorney to inquire as to the conviction and as to the

14

> underlying facts. I find that an individual who would shoplift or who
> would steal from people clearly places his self-interest above that of
> society and indicates to the jury the character of an individual whose
> credibility should be called into question based upon prior conduct.

Dkt. No. 6-2 at ECF 81-83 (italicization added). Notably, the court went on to deny other applications by the prosecution:

> I [however] agree with [defense] counsel regarding the disorderly
> conduct. I would not allow the District Attorney to inquire as to that.
> Regarding the two individual cases that were not prosecuted, although
> the People are correct that it is a prior bad act and they do have a good
> faith basis to ask those questions, I find those two would be
> cumulatively so prejudicial to the defendant, that it would frustrate the
> rule under *Sandoval* and its predecessor case *U.S. v. Luck* from the
> federal system. So, therefore, I am going to prohibit any mention of
> those two incidents.

*Id.* (italicization added).

Like a *Molineux* challenge, a claim that the trial court erred in its *Sandoval* ruling brings up a matter of "state law and not subject to habeas review" unless the petitioner can "show that the erroneous evidentiary ruling was so pervasive as to have denied him a fundamentally fair trial, or so extremely unfair that its admission violates fundamental conceptions of justice." *Ward v. Lee*, No. 11-cv-1068 (ENV), 2014 WL 2465607, at *3 (E.D.N.Y. May 30, 2014) (quoting *John v. New York*, No. 12 Civ. 1944 (CM) (JCF), 2013 WL 6487384, at *9 (S.D.N.Y. Nov. 25, 2013)). Unless the erroneously admitted evidence was the fulcrum that provided the basis for conviction or removed a

reasonable doubt that would otherwise be present, there is no constitutional violation that would warrant federal habeas relief. *See* Part I.A, *supra.* That is the case presented in this petition.

Again, the trial court was well within its discretion in determining that evidence of Lewis's prior theft and larceny was relevant, and such evidence appears to fall within the line of New York decisions that allow introduction of prior theft-related crimes as "highly relevant to the issue of credibility because they demonstrate the defendant's willingness to deliberately further his [or her] self-interest at the expense of society." *People v. Harris,* 74 A.D.3d 984, 984, 902 N.Y.S.2d 190 (2d Dep't 2010) (alteration in original) (citation omitted). More specifically, finding the ruling comfortably within the exercise of discretion by the trial court, the Appellate Division saw no error. *See Lewis,* 101 A.D.3d at 1155.

Lastly, as described earlier, evidence of Lewis's guilt was startling in its depth and devastating in its impact. *See Sunter v. Capra,* 13-CV-1551 (CM) (RLE), 2016 WL 836346, at *7 (S.D.N.Y. Feb. 29, 2016), *certificate of appealability denied* (July 7, 2016) ("Details of [defendant's] prior convictions did not deny [him] a fundamentally fair trial because the evidence of his guilt was overwhelming."); *Lopez v. Graham,* No. 11 Civ. 07729 (PAC) (MHD), 2014 WL 2940855, at *13 (S.D.N.Y. June 30, 2014). On this claim, the determination by the Appellate Division that the admission of the challenged evidence by the trial court was not erroneous and, therefore, impliedly, that it did not deny Lewis a fundamentally fair trial was hardly erroneous and, if it was, it certainly was not an unreasonable application of clearly defined federal law. *See Lewis,* 101 A.D.3d at 1155 (finding that the Sandoval ruling was "a provident exercise of discretion").

II.     The Right to Confront Witnesses Against Him

By failing to object at trial, Lewis's claim that his confrontation rights were violated was procedurally defaulted. *See Lewis,* 101 A.D.3d at 1155 (citing CPL 470.05(2)). The affirmance of these convictions in the teeth of that claimed violation rests on an adequate and independent state

ground. *See Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) ("[The contemporaneous objection rule] is a state law ground on which the New York appellate court's decision is based, and that ground is both independent of any federal question and adequate under firmly established and regularly followed state law."). Plus, there has been no demonstration of "cause" for failing to comply with that rule, nor has there been a showing that a fundamental miscarriage of justice would result from a failure to entertain Lewis's confrontation clause claim now, *i.e.*, that Lewis is actually innocent. *See McCleskey*, 499 U.S. at 494-95.

First and foremost, and the record makes crystal clear, even had there been no DNA evidence at all, the evidence against Lewis was practically insurmountable. Powerfully, each victim made a compelling in-court identification of Lewis. To recap, CW-1 confronted Lewis "face-to-face" as she was brutally assaulted, Tr. at 118-19, 147, 157-58, and, indeed, had encountered him on an elevator before his attack. *Id.* at 115. While CW-2 was not available to view the station house lineup, both CW-1 and CW-3 positively identified him at that line up. CW-2 also identified Lewis at trial; she said she had been "standing right next to" him in her apartment lobby before the attack, where she got a "good look at his face", *id.* at 222. She too was positioned face-to-face with Lewis during the attack. *Id.* at 226, 231. CW-3 encountered Lewis in a similar environment: a lit elevator, where she was able to observe his face, *id.* at 293-95, before later selecting him from a lineup. *Id.* at 304-07. With the voices of the victims providing unmistakable proof of guilt, virtually no error in the admission of the DNA evidence would approach the magnitude required to sweep away Lewis's procedural default under New York law. *See Coleman v. Thompson*, 501 U.S. 722, 729-32, 111 S. Ct. 2546, 2554-55, 115 L. Ed. 2d 640 (1991). Federal *habeas* relief on this ground is unavailable. Nor, as the Second Department observed, does the claim have any substantive merit. *See Lewis*, 101 A.D.3d at 1155 ("The contention, is, in any event, without merit."

(citing *Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion)).

III.     Unfair Sentencing

By imposing an aggregate sentence that totes, Lewis says, to a century and three-quarters, the Judge, he contends, imposed a constitutionally excessive punishment and displayed an "inappropriately vindictive" attitude when, at sentencing, he proclaimed: "As you told [CW-1] that she was going to do something for you . . . well, I'm going to do something for you today . . . [Y]ou indicated to [CW-2] that you've done this before . . . so will I . . . [A]s you . . . demand[ed] that [CW-3] do it right to you, . . . I will do it right to you this time." S. Tr. at 14-15. The trial court added that it "hop[ed] and pray[ed]" that Lewis would not "be set loose upon society again." *Id.* at 15.[9]

This argument is a nonstarter. "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003). Here, Lewis does not allege that the sentence imposed upon him was outside the permissible range. He also cannot because none are. Lewis was sentenced within permissible parameters.[10] The scolding comments

---

[9]     Lewis also claims that the judge had a death in the family during his trial, causing the court to be adjourned for a day while the judge attended the funeral and, petitioner speculates that the judge "took his emotions out" on Lewis at sentencing, as evidenced by the "smart remarks." Pet. at 2. Even though such facts do not appear to be raised in his state court briefs, the Court will construe this contention as being part of the argument Lewis did present to the Appellate Division, that "in light of the Court's spiteful remarks at sentencing, [Lewis]'s aggregate sentence of more than 174 years' incarceration was excessive." Lewis App. Br. at 38.

[10]     Lewis was sentenced to (i) 25 years, (ii) 7 years, and (iii) 7 years, respectively, for the crimes he committed against CW-1; (i) 25 years, (ii) 25 years, and (iii) 25 years, respectively, for the crimes he committed against CW-2; and (i) 25 years, (ii) 25 years, (iii) 7 years, and (iv) 3 ½ to 7 years for the crimes against CW-3. S. Tr. at 14-15. At sentencing, the judge stated that all sentences were to run consecutively. *Id.* at 15.

of the judge at the time of sentencing add absolutely nothing to the mix. *See Alfini*, 245 F. Supp. 2d at 502 (collecting cases). On this ground, the writ is denied.

IV.    Coerced Trial

In a bizarre concoction specifically brewed for presentation in this proceeding, Lewis claims that he was coerced to go to trial before a biased trial judge. One of its mind-boggling ingredients is the contention that he went to trial because he understood that his sentence would be heavier if he took a plea. Pet. at 2. This claim has never before been presented to any state court and is unexhausted. *See* 28 U.S.C. § 2254(b)(1)(A); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011). Perhaps sensing the futility of it, petitioner does not even try to explain, much less excuse, his default. The fact that this claim is unexhausted not only does not bar its dismissal, 28 U.S.C. § 2254(b)(2), it is the basis of its dismissal. *See Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 1535, 161 L. Ed. 2d 440 (2005) (noting that, under AEDPA, a "stay and abeyance" of habeas proceedings is appropriate only if "there [is] good cause for the petitioner's failure to exhaust his claims first in state court," and, furthermore, the unexhausted claims must not be "plainly meritless" (citation omitted)). Indeed, this contention is patently meritless and flatly contradicted by the record.

Notwithstanding the there is no absolute constitutional right to plead guilty, *see United States v. Penev*, 362 F. App'x 170, 173 (2d Cir. 2010), the record is clear that the possibility of a plea was discussed with the trial judge and the advice the trial judge gave Lewis is precisely the opposite of what he now claims:

> [R]ight now we're at a state where there is a potential, if you wish to engage in a plea bargain, of saving yourself several decades of imprisonment, if you're guilty.
>
> ...

I don't know what you expect [defense counsel] to do . . . when the jury

hears this one lady [who] is going to come up on the stand and say that

she doesn't know you from a hole in the wall and you violently and

savagely attacked her, and you left evidence on her, the DNA. And

then another lady is going to come up and she's going to say you

violently attacked her, and you left scientific evidence on her. And then

a third lady is going to come up and say the same thing.

...

[Defense counsel] is a lawyer. He's not a magician, he is not going to

make this stuff go away. And so you are at the end of the road right

now, because this is the last time that I'll engage in plea negotiations

with you, because they have the witnesses out in the hallway, okay?

Dkt. No. 6-2 at ECF 3-5. Then, after conferring with counsel, Lewis's lawyer informed the trial

court that he "had a conversation with [his] client," and that they had "discussed this at length in the

past as well" and that it was Lewis's "desire to go forward with the trial." *Id.* at ECF 6. As the

record makes manifestly apparent, this claim is "plainly meritless", *Rhines*, 544 U.S. at 277, both

substantively and procedurally. It is dismissed.[11]

---

[11]    As best as the Court can discern, due to a scrivener's error by Lewis's appellate counsel, several other point headings were improperly included in petitioner's brief to the Appellate Division. *See* Lewis. App. Br. at i-ii, ECF 4-5. No such arguments, however, were fleshed out or presented to the Second Department. Significantly, nothing in the trial record would even remotely support such contentions, even if they were not inadvertently included in the brief. Presumably, they are reiterated in this petition because Lewis copied these headings from his state court filings. To the extent that petitioner intended to convert the scrivener's error into a recitation of additional claims, those claims are also unexhausted and meritless. They are also dismissed.

## Conclusion

For all the foregoing reasons, a writ of *habeas corpus* is denied and the petition dismissed.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c)(2).

The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Memorandum and Order would not be taken in good faith and, therefore, *in forma pauperis* is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21, 8 L.Ed.2d 21 (1962).

The Clerk of Court is directed to mail a copy of the Memorandum and Order to petitioner, to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
October 28, 2017

/s/ USDJ ERIC N. VITALIANO

ERIC N. VITALIANO
United States District Judge